# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| DR. RICHARD ROSE<br>*Plaintiff,*<br><br>-v-<br><br>UNIVERSITY OF LA VERNE, DR. LAURA HARTLEY, individual and official capacities, DR. SHANNON MATHEWS, individual and official capacities, DR. RISA DICKSON, official capacity, KEN O'DONNELL, official capacity, and DOE DEFENDANTS 1–20,<br>*Defendants.* | Case No.______________________________<br><br>**<u>COMPLAINT AND JURY DEMAND</u>** |

**CIVIL ACTION**

*This action alleges, inter alia, violations of the First and Fourteenth Amendments to the United States Constitution, as enforced through 42 U.S.C. § 1983, arising from the unlawful suspension, deprivation of due-process protections, retaliatory termination, and stigmatizing false statements made by University administrators during the disciplinary proceedings against Plaintiff, a tenured African American professor, thereby infringing upon his constitutional rights to free speech, petition, and procedural fairness.*

Plaintiff, DR. RICHARD ROSE, by and through their attorneys, LLG National Law Group, and by way of Complaint, brings this action for damages and other equitable relief against Defendants, UNIVERSITY OF LA VERNE, DR. LAURA HARTLEY, individual and official capacities, DR. SHANNON MATHEWS, individual and official capacities, DR. RISA DICKSON, official capacity, KEN O'DONNELL, official capacity, and DOE DEFENDANTS 1–20, alleging as follows:

**<u>INTRODUCTION</u>**

1. This action arises from the unlawful termination of Dr. Richard Rose, a tenured

African American professor with 34 years of distinguished service to the University of La Verne ("ULV"), in retaliation for his protected speech, protected activity, and longstanding leadership of the Ecumenical Center for Black Church Studies ("ECBCS"), a ULV-founded program serving Black and Latino communities since 1974.

2. Defendants terminated Dr. Rose based on fabricated allegations, procedural violations, racially discriminatory treatment, and retaliation after he sought due process, filed grievances, contacted the AAUP, and challenged administrative misconduct.

3. Defendants ignored the findings of two independent faculty committees, both of which unanimously concluded that Dr. Rose did not commit misconduct, that the allegations were based on misunderstandings, and that termination was unwarranted.

4. Defendants also violated the Faculty Handbook, AAUP standards, and California law by denying Dr. Rose his right to a faculty hearing, denying his right to appeal to the Board of Trustees, misusing expunged disciplinary records, and terminating him based on false statements.

5. Defendants' actions destroyed Dr. Rose's career, reputation, and livelihood, and inflicted severe emotional and professional harm.

6. Plaintiff seeks compensatory, punitive, and statutory damages, reinstatement or front pay, and all other relief this Court deems just.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiff asserts claims under 42 U.S.C. § 1981, Title VII, and the U.S. Constitution via 42 U.S.C. § 1983.

8. Upon information and belief, Defendants acted under color of state law because their disciplinary authority, governance functions, and enforcement of faculty-related procedures are extensively entwined with state-regulated educational requirements, state-mandated accreditation standards, and federally supported academic programs administered in coordination

with state agencies. Plaintiff alleges that Defendants exercised authority traditionally associated with public institutions, namely, regulating faculty employment, adjudicating disciplinary matters affecting constitutional interests, and administering federally funded educational initiatives, such that their actions are fairly attributable to the state for purposes of 42 U.S.C. § 1983.

9. This Court has supplemental jurisdiction exists under 28 U.S.C. § 1367 for related state-law claims, including wrongful termination, breach of contract, and defamation.

10. Venue is proper under 28 U.S.C. § 1391 because the events giving rise to this action occurred in this District and Defendants reside or conduct business here.

**PARTIES**

11. At all times relevant hereto, Plaintiff DR. RICHARD ROSE is an African American male, a resident of California, and a former tenured Professor of Religion & Philosophy at the University of La Verne ("ULV"), where he served for more than thirty-four years in teaching, scholarship, service, and community engagement. Plaintiff's residential address is believed to be 648 Converse Ave., Claremont, CA 91711.

12. At all times relevant hereto, Defendant UNIVERSITY OF LA VERNE is a private university located at 1950 Third Street, La Verne, California 91750, and may be served through its Office of the President at the same address. ULV exercised authority over faculty employment, tenure, discipline, and termination, and acted through its senior administrators in the events giving rise to this action.

13. At all times relevant hereto, Defendant DR. LAURA HARTLEY served as Interim Provost and Vice President for Academic Affairs, with responsibility for overseeing faculty discipline, implementing University policies, and exercising final decision-making authority over suspensions and terminations. She may be served at 1950 Third Street, La Verne, California 91750.

Said Defendant is sued in both her individual and official capacities.

14. At all times relevant hereto, Defendant DR. SHANNON MATHEWS served as Dean of the College of Arts & Sciences, with supervisory authority over faculty within the College, participation in disciplinary evaluations, and responsibility for recommending or opposing adverse employment actions. She may be served at 1950 Third Street, La Verne, California 91750. Said Defendant is sued in both her individual and official capacities.

15. At all times relevant hereto, Defendant DR. RISA DICKSON served as President of ULV, with ultimate institutional authority over faculty employment matters, enforcement of University policies, and oversight of the Provost's Office. She may be served at 1950 Third Street, La Verne, California 91750. Said Defendant is sued in her official capacity.

16. At all times relevant hereto, Defendant KEN O'DONNELL is the current Provost of ULV, with responsibility for academic governance, faculty oversight, and the implementation and enforcement of disciplinary procedures. He may be served at 1950 Third Street, La Verne, California 91750. Said Defendant is sued in his official capacity.

17. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave from the court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

## FACTUAL BACKGROUND

17. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above and incorporates same as if fully set forth at length herein.

18. Dr. Richard Rose devoted more than thirty-four years of service to the University of La Verne ("ULV"), where he built a distinguished career as a tenured professor of Religion and Philosophy, a department chair, a diversity consultant to the President, and a nationally

recognized scholar of Black religious studies.

19. His work was inseparable from the Ecumenical Center for Black Church Studies ("ECBCS"), a program founded by ULV in 1974 and operated for five decades as a University-affiliated academic and community partnership serving Black and Latino communities across Southern California.

20. From the beginning of his employment in 1991, Dr. Rose taught ULV courses at ECBCS, recruited students, coordinated programming, and helped sustain the University's off-campus Religion degree program. In 1996, he was hired by presidential appointment to the full-time faculty.

21. Over the next three decades, ULV repeatedly affirmed ECBCS as an institutional partner: ULV provided scholarships, administrative support, faculty oversight, and research funding; ULV's Multicultural Center co-sponsored ECBCS events; and ULV's Institutional Review Board ("IRB") formally approved ECBCS-based research under Protocol #2022-38, extending approval through October 12, 2024. No other outside organization received such treatment. ECBCS was, in every meaningful sense, a ULV program.

22. Despite this long-standing relationship, beginning in 2022 Dr. Rose became the target of escalating administrative hostility. In January 2022, ULV issued a disciplinary warning accusing him of unprofessional conduct. Dr. Rose filed a grievance, and the Committee on Faculty Rights and Responsibilities ("CFRR") ruled in his favor, ordering the warning removed from his file. The Provost's Office confirmed its removal. Nevertheless, ULV later resurrected this expunged warning as part of a fabricated "pattern" of misconduct.

23. Following the issuance of the first warning, Dr. Rose was subjected to a hostile and increasingly punitive work environment. ULV administrators began treating him with heightened scrutiny, deviating from normal practices, and imposing burdens not applied to other

faculty. During this period, ULV even withheld a paycheck while Dr. Rose was out of the country, an action that had no legitimate basis and caused significant hardship. These retaliatory and irregular actions marked the beginning of a sustained pattern of hostility that continued through the events leading to his termination.

24. In February 2024, ULV issued a second disciplinary notice claiming Dr. Rose improperly used the title "Coordinator of ECBCS." Yet ULV's own emails show that Human Resources had previously informed him the position was being restored, and Dr. Rose removed the title immediately upon being told otherwise.

25. The notice was based on a flyer created by an outside seminary, not by Dr. Rose, and ULV never alleged that he performed any Coordinator duties after the program was discontinued. This second warning, like the first, was unsupported by evidence.

26. The conflict escalated in 2024 as ECBCS prepared for its 50th Anniversary Celebration, a major academic and community event planned in consultation with ULV President Pardis Mahdavi, who referred the matter to the Provost's Office and University Events for support. ULV's Director of Scheduling, Veronica Ashcroft, confirmed her willingness to assist and worked with Dr. Rose for months on room reservations, logistics, and event planning.

27. Dr. Rose reserved campus facilities in September 2023 using the same process he had used for decades, listing his department affiliation. ULV approved the reservations and made no objection.

28. In early October 2024, ULV abruptly informed Dr. Rose that ECBCS would be charged more than $7,000 for use of campus facilities for the 50th Anniversary Celebration, despite decades of institutional practice treating ECBCS as a ULV program and despite ULV's own involvement in planning the event. On October 11, 2024, ULV issued a revised contract reducing the assessment to an effective $1,300 fee. The contract originated on October 11, 2024,

and Dr. Rose signed it under duress on October 17, 2024, after ULV threatened to cancel the event.

29. This contradicted fifty years of institutional practice, the IRB-approved research partnership, and ULV's own involvement in planning the event. Under threat of cancellation, Dr. Rose signed the contract under duress.

30. After the event, Dr. Rose attempted in good faith to resolve the fee. He spoke with ULV's Chief Financial Officer, Avo Kechichian, who indicated he could assist. Dr. Rose emailed Ashcroft, copying Kechichian, reporting their conversation. Ashcroft then emailed Kechichian requesting account information to process the payment.

31. Kechichian did not deny the representation at the time. The next day, he responded that covering the fee was "outside his purview." Dr. Rose then drafted a GoFundMe appeal and asked ULV administrators whether alternative arrangements could be made. ECBCS bank statements show the organization had less than $400 and could not pay the fee.

32. Despite these efforts, Interim Provost Laura Hartley accused Dr. Rose of "fraud" and "breach of trust," falsely claiming he never intended to pay the fee and had lied about his conversation with the CFO. Email timestamps contradict her account. The accusation became the centerpiece of a campaign to remove him.

33. On January 17, 2025, Interim Provost Hartley issued a letter stating that Dr. Rose would be placed on "administrative leave" effective February 3, 2025, at which point he would be barred from campus and prohibited from communicating with faculty involved in the disciplinary process. Before the leave became effective, Dr. Rose continued teaching throughout the entire month of January, came to campus at least four times per week, and remained fully engaged in faculty governance.

34. His address to the Faculty Assembly occurred before the effective date of the

leave. At no time did any faculty member express fear, concern, or discomfort regarding his presence, underscoring the absence of any legitimate basis for an emergency suspension.

35. The American Association of University Professors ("AAUP") later concluded that this suspension violated AAUP Regulation 5, ULV's Faculty Handbook, and basic principles of academic due process. Hartley threatened Dr. Rose with termination unless he resigned before February 3, 2025.

36. Despite these threats, Dr. Rose participated in the formal faculty hearing process under Faculty Handbook §4.3.3. On February 22, 2025, the College of Arts & Sciences Promotion and Tenure Committee ("CAS-ARPT") found that the allegations against him were the result of misunderstandings, not misconduct, and recommended only a final warning.

37. On March 11, 2025, the University Promotion & Tenure Committee ("FPTC") unanimously voted 11–0 that Dr. Rose should not be terminated and should be reinstated immediately. Dean Shannon Mathews declined to recommend termination.

38. Rather than accept these findings, Hartley escalated her efforts. On April 18, 2025, the AAUP wrote to ULV expressing grave concerns about due-process violations.

39. On April 29, 2025, one day after responding to the AAUP, Hartley issued a termination letter, now invoking the Employee Handbook instead of the Faculty Handbook to avoid the protections of §4.3.3. She accused Dr. Rose of retaliation, insubordination, and fraud, again relying on the misrepresented Avo timeline and the expunged 2022 warning.

40. Dr. Rose appealed. On June 16, 2025, CFRR issued a formal finding that Hartley had violated the Faculty Handbook by unilaterally terminating the §4.3.3 process, that only the faculty member may end such proceedings, and that Dr. Rose had been unlawfully denied his right to appeal to the Board of Trustees under §4.3.4. CFRR recommended that his appeal rights be restored.

41. ULV ignored the recommendation. Dr. Rose's termination became effective May 23, 2025.

42. The termination ended a thirty-four-year career, destroyed his professional reputation, severed his relationship with students and community partners, and inflicted severe emotional and economic harm. It also severed ULV's historic relationship with ECBCS, a program the University founded, nurtured, and celebrated for half a century, until administrators unfamiliar with ULV's culture and history abruptly reclassified it as "external" and punished the faculty member most closely associated with it.

43. Dr. Rose was fired for doing the work ULV had hired him to do, approved him to do, funded him to do, and celebrated him for doing. His termination was the culmination of years of administrative hostility, procedural violations, racialized treatment, and retaliation for protected activity.

44. Upon information and belief, the University of La Verne and its senior administrators operate under extensive state and federal regulatory frameworks governing accreditation, faculty governance, and the administration of publicly funded educational programs. Plaintiff alleges that ULV's disciplinary procedures, tenure protections, and faculty-governance structures are mandated or shaped by state-regulated accreditation bodies whose standards are incorporated into University policy and enforced through state oversight mechanisms.

45. Plaintiff further alleges that ULV administers federally supported academic programs and receives federal funding conditioned on compliance with state-implemented regulations, thereby entwining ULV's governance and disciplinary authority with state educational functions.

46. Plaintiff alleges that Defendants exercised authority typically associated with

public institutions, such as managing faculty employment, resolving disciplinary issues affecting constitutional rights, and enforcing policies tied to state and federal funding, making their actions attributable to the state for purposes of 42 U.S.C. § 1983.

47. Upon information and belief, ULV's accreditation through the Western Association of Schools and Colleges ("WASC") requires compliance with state-mandated governance, disciplinary, and tenure-protection standards that mirror those imposed on public institutions. These accreditation requirements are incorporated into ULV's Faculty Handbook and enforced through state-regulated oversight mechanisms, thereby entwining ULV's disciplinary authority with state educational functions. Plaintiff alleges that ULV's disciplinary actions were taken pursuant to these state-regulated frameworks, further supporting that Defendants acted under color of state law.

**COUNT I**
**RACE DISCRIMINATION – 42 U.S.C. § 1981**
**(Against All Defendants)**

48. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

49. Plaintiff Dr. Richard Rose is a Black tenured professor who, for more than three decades, served the University of La Verne ("ULV") with distinction, including as Coordinator of the Ecumenical Center for Black Church Studies ("ECBCS"), a program founded by ULV in 1974 and historically integrated into the University's academic mission.

50. Section 1981 guarantees all persons the same right to make and enforce contracts as is enjoyed by white citizens, including the rights to contract, to the benefits and privileges of contractual relationships, and to be free from discrimination in the performance, modification, and termination of contracts.

51. Plaintiff's employment relationship with ULV, including his tenure contract,

faculty appointment, and the contractual protections of the Faculty Handbook, constitutes a contractual relationship within the meaning of § 1981.

52. Defendants intentionally interfered with Plaintiff's contractual rights and treated him less favorably than similarly situated non-Black faculty by subjecting him to heightened scrutiny, fabricated disciplinary actions, and a procedurally defective termination process that departed sharply from established University norms.

53. Defendants' actions were motivated, at least in substantial part, by racial animus and stereotypes about Black leadership, Black-led programs, and Plaintiff's association with ECBCS - a historically Black academic program that ULV abruptly reclassified as an "outside organization" only after decades of institutional partnership.

54. Defendants weaponized this reclassification to accuse Plaintiff of "misrepresentation," despite ULV's own documented approvals, IRB certifications, administrative collaborations, and long-standing recognition of ECBCS as a University-affiliated program.

55. Defendants further relied on racially-tinged assumptions that Plaintiff, as a Black faculty member, was dishonest, insubordinate, or untrustworthy, accusations contradicted by documentary evidence, including email timestamps, IRB approvals, and the findings of multiple faculty committees.

56. Defendants imposed discipline and terminated Plaintiff through a process riddled with procedural irregularities, including:

a. resurrecting a 2022 disciplinary letter that had been formally overturned and ordered removed;

b. issuing a 2024 "final warning" based on a fabricated violation of a verbal instruction;

c. misrepresenting Plaintiff's conversation with CFO Avo Kechichian regarding

the $1,300 event fee;

d. ignoring exculpatory evidence showing Plaintiff's efforts to satisfy the fee;

e. bypassing mandatory faculty-governance procedures under § 4.3.3 of the Faculty Handbook; and

f. denying Plaintiff his contractual right to appeal to the Board of Trustees.

57. These deviations from established policy were not applied to white faculty and were inconsistent with ULV's treatment of similarly situated non-Black employees, who were not subjected to termination for comparable or more serious alleged infractions.

58. Both faculty committees charged with evaluating the allegations, the CAS-ARPT Committee and the University P&T Committee, found that Plaintiff's conduct did not warrant termination or loss of tenure. Defendants ignored these findings and proceeded with termination anyway, demonstrating discriminatory intent and pretext.

59. Defendants' actions were purposeful, malicious, and undertaken with reckless disregard for Plaintiff's federally protected rights, including his right to contract on equal terms and to be free from race-based interference with his employment.

60. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff suffered loss of employment, loss of tenure, loss of salary and benefits, reputational harm, emotional distress, humiliation, and damage to his professional standing in the academic community. Discrimination was the "but for" cause of the challenged action.

61. Defendants' conduct was willful, wanton, and in reckless disregard of Plaintiff's civil rights, entitling him to compensatory and punitive damages under 42 U.S.C. § 1981.

## COUNT II
## RETALIATION – 42 U.S.C. § 1981
***(Against All Defendants)***

62. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above

and incorporates the same as if fully set forth at length herein.

63. Plaintiff engaged in protected activity under § 1981 when he opposed discriminatory treatment, raised concerns regarding disparate treatment of ECBCS and its predominantly Black student and alumni community, and advocated for the continuation of longstanding University partnerships that supported Black students, clergy, and community leaders.

64. Plaintiff further engaged in protected activity when he reported procedural irregularities, discriminatory conduct, and the misuse of disciplinary processes directed at him, including fabricated warnings, mischaracterized communications, and the University's sudden reclassification of ECBCS as an "outside organization" despite decades of institutional partnership.

65. Following Plaintiff's protected activity, Defendants retaliated against him through escalating adverse actions, including:

a. issuing baseless disciplinary warnings;

b. misusing a previously rescinded warning as pretextual evidence of "misconduct";

c. initiating an improper administrative leave;

d. restricting Plaintiff's access to campus and colleagues;

e. misrepresenting Plaintiff's communications with University officials; and

f. ultimately terminating his thirty-four-year career.

66. Defendants' retaliatory actions were taken with knowledge of Plaintiff's protected activity and were causally connected to his opposition to discriminatory treatment and his advocacy on behalf of ECBCS and its community. Discrimination was the "but for" cause of the challenged action.

67. Defendants' stated reasons for termination, including alleged "insubordination," "breach of trust," and "misrepresentation", were false, pretextual, and inconsistent with the findings of both faculty committees, which unanimously concluded that Plaintiff's conduct did not warrant termination or loss of tenure.

68. The close temporal proximity between Plaintiff's protected activity and the escalation of disciplinary measures, combined with Defendants' shifting explanations, reliance on rescinded or fabricated allegations, and disregard of exculpatory evidence, demonstrates that the stated reasons for discipline and termination were pretextual. Defendants' actions deviated sharply from established University norms and were inconsistent with their treatment of faculty who had not engaged in protected activity.

69. Defendants acted with malice and reckless disregard for Plaintiff's federally protected rights, using the disciplinary process as a tool of retaliation rather than legitimate governance.

70. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff suffered severe economic loss, reputational harm, emotional distress, and the destruction of a decades-long academic career.

**COUNT III**
**VIOLATION OF DUE PROCESS (42 U.S.C. § 1983)**
***(Against All Defendants)***

71. Plaintiff hereby repeats all the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

72. At all relevant times, Plaintiff possessed constitutionally protected liberty and property interests in his tenured faculty position, his professional reputation, and his continued employment at the University of La Verne, interests recognized under the Fourteenth Amendment and enforceable through 42 U.S.C. § 1983.

73. Plaintiff's tenured appointment conferred a legitimate claim of entitlement to continued employment under ULV's Faculty Handbook, which expressly provides that tenured faculty may be terminated only for adequate cause and only after completion of the § 4.3.3 hearing process. These contractual and institutional guarantees create a protected property interest under the Fourteenth Amendment, and Plaintiff reasonably relied on these guarantees throughout his thirty-four-year career.

74. Plaintiff alleges that Defendants acted under color of state law because their disciplinary decisions, governance authority, and enforcement of faculty-related procedures were undertaken within a framework extensively entwined with state-regulated accreditation standards, state-implemented oversight mechanisms, and federally supported educational programs administered in coordination with state agencies. Plaintiff alleges that Defendants' actions in suspending, disciplining, and terminating a tenured faculty member constituted the exercise of authority attributable to the state for purposes of 42 U.S.C. § 1983.

75. Defendants, acting under color of state law through their governance, disciplinary authority, and institutional decision-making, deprived Plaintiff of these protected interests without providing the procedural safeguards required by the Constitution, including notice, a meaningful opportunity to be heard, and an impartial adjudicatory process.

76. Defendants initiated disciplinary proceedings against Plaintiff based on fabricated, stale, or previously rescinded warnings, including a 2022 "First Warning" that the Faculty Rights and Responsibilities Committee had ordered removed from his file, and a 2024 warning based on a mischaracterized verbal instruction. These documents were improperly revived and weaponized to manufacture a false "pattern" of misconduct.

77. Defendants placed Plaintiff on an indefinite administrative leave on January 17, 2025, restricting his access to campus, colleagues, and evidence, despite the absence of any

allegation that Plaintiff posed a threat of immediate harm, contrary to AAUP standards, the University's own Faculty Handbook, and constitutional due process requirements.

78. Defendants further denied Plaintiff due process by unilaterally terminating the § 4.3.3 faculty hearing process, despite the Faculty Handbook's explicit requirement that only the faculty member, not the Provost, may conclude such proceedings. This deprived Plaintiff of the exclusive process governing revocation of tenure and termination.

79. Defendants also denied Plaintiff his right to appeal to the Board of Trustees under § 4.3.4 of the Faculty Handbook by falsely informing him that no such right existed, even though the Handbook expressly grants a direct appeal following any determination to deprive a faculty member of tenure.

80. Both faculty committees charged with reviewing the allegations, the CAS ARPT Committee and the University P&T Committee, found that Plaintiff's conduct did not warrant termination or loss of tenure and recommended reinstatement. Defendants disregarded these findings without explanation, violating established norms of shared governance and depriving Plaintiff of the impartial faculty adjudication guaranteed by University policy and constitutional due process.

81. Defendants further deprived Plaintiff of due process by misrepresenting the content and sequence of his communications with University officials, including falsely asserting that Plaintiff lied about the CFO's statements, despite email timestamps and witness communications demonstrating otherwise.

82. Defendants retaliated against Plaintiff for seeking guidance from the AAUP by treating the AAUP's independent correspondence as a violation of University directives and using it as an additional basis for termination, an action that violated Plaintiff's right to petition and further tainted the disciplinary process with bias and retaliatory motive.

83. Defendants' actions were arbitrary, capricious, and undertaken with deliberate indifference to Plaintiff's constitutional rights, including his right to fair procedures, his right to continued employment absent adequate cause, and his right to defend his reputation against false and stigmatizing accusations.

84. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff suffered the loss of his tenured position, severe reputational harm, emotional distress, economic damages, and the destruction of a thirty-four-year academic career.

**COUNT IV**
**RETALIATION FOR PROTECTED SPEECH - FIRST AMENDMENT § 1983**
***(Against All Individual Defendants)***

85. Plaintiff hereby repeats all the allegations and exhibits contained in the Complaint thus far above and incorporates same as if fully set forth at length herein.

86. Plaintiff engaged in protected speech under the First Amendment when he raised concerns about procedural irregularities, discriminatory treatment, and violations of academic freedom within the University of La Verne, including but not limited to: (a) communicating with faculty governance bodies; (b) addressing the Faculty Assembly regarding due process failures; and (c) seeking guidance and assistance from the American Association of University Professors ("AAUP"), a national organization dedicated to protecting academic freedom and faculty rights.

87. Plaintiff's speech addressed matters of public concern, including institutional governance, racial equity, academic freedom, and the integrity of disciplinary processes at a university that receives federal funding and operates under public-facing governance structures.

88. Plaintiff's speech addressed systemic issues of public importance, including the integrity of faculty disciplinary processes, compliance with accreditation standards, racial equity in academic governance, and the misuse of University authority affecting students, faculty, and the broader community. These matters extend beyond internal personnel disputes and implicate

issues of public accountability within an institution that receives federal funding and operates under public-facing governance structures.

89. Plaintiff's communications with the AAUP, made in his capacity as a dues-paying member, constituted protected petitioning activity under the First Amendment. The AAUP's subsequent letter to University leadership was independently authored and sent by the AAUP, not by Plaintiff.

90. Defendants, including Interim Provost Hartley and other individual administrators, expressly cited Plaintiff's protected speech as a basis for adverse action. In the April 29, 2025, termination letter, Defendants accused Plaintiff of "attempting to impugn the reputation" of administrators by contacting the AAUP and treated the AAUP's independent correspondence as a violation of University directives.

91. Defendants further characterized Plaintiff's January 29, 2025, Faculty Assembly remarks, which were made before his administrative leave began, and addressed due process concerns, as "insubordination" and used those remarks as an additional basis for termination.

92. Defendants' adverse actions, including placing Plaintiff on administrative leave, restricting his access to campus and colleagues, mischaracterizing his communications, and terminating his thirty-four-year tenured employment, were substantially motivated by Plaintiff's protected speech and petitioning activity.

93. The temporal proximity between Plaintiff's protected speech (January–April 2025), the AAUP's intervention (April 18 and May 5, 2025), and Defendants' sudden escalation to termination (April 29, 2025) demonstrates a retaliatory motive.

94. Defendants' actions would deter a person of ordinary firmness from engaging in protected speech, raising concerns about institutional misconduct, or seeking assistance from external oversight bodies such as the AAUP.

95. Defendants acted under color of state law through their exercise of disciplinary authority, governance functions, and enforcement of University policies, and their retaliatory conduct violated clearly established First Amendment rights.

96. As a direct and proximate result of Defendants' retaliatory actions, Plaintiff suffered loss of his tenured position, reputational harm, emotional distress, economic damages, and the destruction of his academic career.

**COUNT V**
**TITLE VII - RACE DISCRIMINATION**
***(Against Defendant University of La Verne)***

97. Plaintiff hereby repeats all the allegations and Exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

98. Plaintiff is an African American tenured professor who served the University of La Verne ("ULV") with distinction for more than thirty years, including as Coordinator of the Ecumenical Center for Black Church Studies ("ECBCS"), a program founded by ULV in 1974 to serve Black and Latino communities.

99. Throughout his career, Plaintiff consistently received positive evaluations, held leadership roles, secured grants, and maintained an exemplary record of service, scholarship, and community engagement.

100. Beginning in 2022, ULV administrators, including Defendants Mathews, Hartley, and others, subjected Plaintiff to escalating scrutiny, hostility, and disciplinary actions that were not imposed on similarly situated non-Black faculty, even when they engaged in comparable conduct or administrative errors.

101. The disciplinary actions taken against Plaintiff, including the 2022 "warning," the 2023 "verbal warning," the February 2024 Disciplinary Action Notice, and the January 2025 administrative leave, were procedurally defective, factually unsupported, and issued in direct

contradiction to faculty-governance findings that exonerated Plaintiff or recommended lesser measures.

102. ULV repeatedly relied on false, exaggerated, or fabricated allegations to portray Plaintiff as insubordinate, despite clear evidence that:

a. he followed established practices for reserving campus space;

b. he acted with administrative approval or longstanding institutional custom;

c. he attempted in good faith to resolve the $1,300 facilities fee; and

d. he was misled by ULV officials regarding ECBCS's status and sponsorship.

103. ULV's shifting explanations, inconsistent application of policy, and disregard for exculpatory evidence demonstrate that the stated reasons for discipline and termination were pretext for discrimination.

104. ULV administrators repeatedly minimized, dismissed, or denied the University's 50-year partnership with ECBCS, a program historically rooted in Black religious education, while simultaneously weaponizing that denial to discipline Plaintiff for activities that had long been part of his job duties and scholarly work.

105. ULV's treatment of ECBCS as an "outside organization," despite decades of institutional partnership, IRB-approved research, and University-sponsored programming, reflects a racially-charged devaluation of Black-centered academic work and those associated with it.

106. Plaintiff was disciplined and terminated for conduct that white faculty routinely engaged in without consequence, including reserving rooms, coordinating community-based programs, communicating with administrators, and seeking institutional support for academic initiatives.

107. Upon information and belief, similarly situated non-Black faculty who engaged in comparable conduct, including reserving campus facilities, coordinating community-based

academic programs, communicating with administrators regarding event logistics, or relying on longstanding institutional practices, were not subjected to disciplinary warnings, administrative leave, or termination. ULV routinely resolved such matters informally for non-Black faculty, without resorting to formal discipline or adverse employment action.

108. ULV further ignored the findings of two independent faculty committees, the CAS-ARPT Committee and the University P&T Committee, which unanimously concluded that Plaintiff's conduct did not warrant termination or loss of tenure and recommended reinstatement.

109. Instead, ULV's Interim Provost unilaterally overrode faculty governance, escalated the charges, and terminated Plaintiff in violation of University policy, AAUP standards, and established due-process protections - actions consistent with discriminatory animus and disparate treatment.

110. Plaintiff's race was a substantial motivating factor in ULV's decisions to discipline, suspend, and terminate him, and in its refusal to follow the same procedures, protections, and norms afforded to non-Black faculty.

111. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff suffered loss of employment, loss of tenure, reputational harm, emotional distress, and significant economic damages.

112. Defendants' conduct was willful, malicious, and undertaken with reckless disregard for Plaintiff's federally protected rights, entitling him to compensatory and punitive damages under Title VII.

**COUNT VI**
**<u>TITLE VII - RETALIATION</u>**
***(Against Defendant University of La Verne)***

113. Plaintiff hereby repeats all the allegations and Exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

114. Plaintiff engaged in protected activity under Title VII when he opposed discriminatory treatment, raised concerns about disparate treatment of ECBCS and its predominantly Black student and alumni community, challenged the misuse of disciplinary processes, and reported procedural irregularities that disproportionately affected him as an African American faculty member.

115. Plaintiff further engaged in protected activity when he filed internal grievances, communicated with faculty governance bodies, addressed the Faculty Assembly regarding due-process violations, and sought assistance from the American Association of University Professors ("AAUP") concerning discriminatory and retaliatory conduct by University administrators.

116. Plaintiff's protected activity was known to all individual Defendants, including but not limited to Interim Provost Hartley, Dean Mathews, and other administrators who participated in or directed the disciplinary process.

117. After Plaintiff engaged in protected activity, Defendants subjected him to escalating adverse employment actions, including:

a. issuing baseless disciplinary warnings;

b. resurrecting a 2022 warning that had been formally overturned and ordered removed;

c. placing Plaintiff on administrative leave without cause;

d. restricting his access to campus and colleagues;

e. mischaracterizing his communications with University officials;

f. treating his AAUP contact as "insubordination"; and

g. terminating his thirty-four-year tenured employment.

118. The adverse actions taken by the University occurred in close temporal proximity

to Plaintiff's protected activity, including his January 29, 2025, Faculty Assembly remarks and his communications with the AAUP in April 2025. The timing of these actions strongly supports an inference of retaliatory motive.

119. The University expressly cited Plaintiff's protected activity as grounds for discipline and termination. In the April 29, 2025, termination letter, Interim Provost Hartley accused Plaintiff of "attempting to impugn the reputation" of administrators by contacting the AAUP and treated the AAUP's independent correspondence as a violation of University directives.

120. The University's stated reasons for discipline and termination, including alleged "insubordination," "breach of trust," and "misrepresentation", were false, inconsistent, and pretextual, and were contradicted by documentary evidence, including email timestamps, IRB approvals, and the findings of two independent faculty committees.

121. Both the CAS-ARPT Committee and the University P&T Committee unanimously concluded that Plaintiff's conduct did **not** warrant termination or loss of tenure and recommended reinstatement. The University ignored these findings and escalated discipline solely against Plaintiff, further demonstrating retaliatory intent.

122. The University's retaliatory conduct culminated in Plaintiff's termination on May 23, 2025, depriving him of his tenured position, salary, benefits, and professional standing.

123. As a direct and proximate result of the University's retaliation, Plaintiff suffered severe economic loss, reputational harm, emotional distress, and the destruction of a decades-long academic career.

124. The University's conduct was willful, malicious, and undertaken with reckless disregard for Plaintiff's federally protected rights, entitling him to compensatory damages, punitive damages where permitted, and all other relief available under Title VII.

## COUNT VII
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

***(Against Defendant University of La Verne)***

125. Plaintiff hereby repeats all the allegations and Exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

126. Plaintiff was a tenured professor with more than thirty years of exemplary service to the University of La Verne ("ULV"), and his employment could not lawfully be terminated for reasons that violate fundamental public policy.

127. California public policy prohibits employers from terminating an employee for reasons that contravene constitutional and statutory rights, including:

a. the right to oppose racial discrimination (Cal. Gov. Code § 12940(h));

b. the right to engage in protected speech and petitioning activity (Cal. Const., art. I, §§ 2–3);

c. the right to academic freedom and shared governance (recognized public policy under California law and AAUP-adopted standards);

d. the right to due process in disciplinary proceedings for tenured faculty; and

e. the right to refuse to participate in unlawful conduct or misrepresentations.

128. Plaintiff engaged in conduct protected by these public policies when he:

a. opposed discriminatory treatment of ECBCS and its predominantly Black student and alumni community;

b. challenged the misuse of disciplinary processes and the resurrection of rescinded warnings;

c. raised concerns about procedural irregularities and due-process violations;

d. communicated with faculty governance bodies regarding administrative misconduct;

e. addressed the Faculty Assembly about matters of public concern; and

f. sought assistance from the American Association of University Professors ("AAUP") regarding violations of academic freedom and due-process standards.

129. Plaintiff's protected activities were substantial motivating factors in Defendant ULV's decisions to discipline, suspend, and ultimately terminate him. Defendant ULV expressly cited Plaintiff's protected speech, including his Faculty Assembly remarks and his contact with the AAUP, as grounds for adverse action.

130. Defendant ULV's stated reasons for termination, including alleged "insubordination," "breach of trust," and "misrepresentation", were false, pretextual, and contradicted by documentary evidence, including email timestamps, IRB approvals, and the findings of two independent faculty committees.

131. Defendant ULV further violated public policy by terminating Plaintiff in direct contravention of the University's own Faculty Handbook, which constitutes an enforceable employment contract and embodies public-policy protections for academic freedom, due process, and shared governance.

132. Defendant ULV ignored the unanimous findings of the CAS-ARPT Committee and the University P&T Committee, both of which concluded that Plaintiff's conduct did **not** warrant termination or loss of tenure and recommended reinstatement. Defendant ULV's decision to override these findings was arbitrary, retaliatory, and contrary to established public policy protecting faculty from politically or personally motivated termination.

133. Defendant ULV also violated public policy by denying Plaintiff his contractual and statutory right to appeal to the Board of Trustees under Faculty Handbook § 4.3.4 and by misrepresenting that no such right existed, thereby depriving Plaintiff of procedural protections mandated by public policy.

134. Defendant ULVs' actions were malicious, oppressive, and carried out with conscious disregard for Plaintiff's rights, including his rights to oppose discrimination, to speak on matters of public concern, to participate in shared governance, and to be free from retaliatory or discriminatory termination.

135. As a direct and proximate result of Defendant ULVs' wrongful termination, Plaintiff suffered loss of his tenured position, loss of salary and benefits, loss of retirement contributions, reputational harm, emotional distress, and the destruction of a thirty-four-year academic career.

136. Plaintiff is entitled to compensatory damages, punitive damages, reinstatement or front pay, and all other relief available under California law for wrongful termination in violation of public policy.

**COUNT VIII**
**BREACH OF CONTRACT**
***(Against Defendant University of La Verne)***

137. Plaintiff hereby repeats all the allegations and Exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

138. Plaintiff and the University of La Verne ("ULV") entered into a binding employment contract, the terms of which were set forth in Plaintiff's tenure appointment, annual faculty contracts, and the ULV Faculty Handbook. Under California law, the Faculty Handbook constitutes an enforceable contract governing the rights, duties, and procedures applicable to tenured faculty.

139. The Faculty Handbook expressly guarantees tenured faculty, including Plaintiff, the right to continued employment absent adequate cause, the right to fair and impartial disciplinary procedures, the right to a faculty hearing under § 4.3.3 before any deprivation of tenure, and the right to appeal to the Board of Trustees under § 4.3.4.

140. Plaintiff fully performed all contractual obligations throughout his thirty-four-year career, consistently meeting or exceeding expectations in teaching, scholarship, service, and community engagement.

141. ULV materially breached the employment contract by failing to follow the mandatory procedures set forth in the Faculty Handbook, including but not limited to:

a. initiating discipline based on rescinded or invalid warnings;

b. issuing a "final warning" without factual basis or procedural compliance;

c. placing Plaintiff on administrative leave without meeting the required standard of "immediate harm";

d. unilaterally terminating the § 4.3.3 faculty hearing process, despite the Handbook's requirement that only the faculty member may end such proceedings;

e. disregarding the findings of the CAS-ARPT Committee and the University P&T Committee, both of which concluded that termination was unwarranted; and

f. denying Plaintiff his contractual right to appeal to the Board of Trustees under § 4.3.4.

142. ULV further breached the contract by misrepresenting to Plaintiff that he had no right to appeal to the Board of Trustees, despite the Faculty Handbook's explicit guarantee of such a right following any determination to deprive a faculty member of tenure.

143. ULV also breached the implied contractual obligation of fairness and adherence to established University norms by resurrecting a 2022 disciplinary warning that had been formally overturned and ordered removed by the Committee on Faculty Rights and Responsibilities.

144. ULV's termination of Plaintiff's employment on May 23, 2025, was carried out in

violation of the Faculty Handbook's procedural safeguards, the University's established customs and practices, and the contractual rights afforded to tenured faculty.

145. As a direct and proximate result of ULV's breaches, Plaintiff suffered substantial damages, including loss of his tenured position, loss of salary and benefits, loss of retirement contributions, reputational harm, emotional distress, and the destruction of a decades-long academic career.

146. Plaintiff is entitled to compensatory damages, reinstatement or front pay, restoration of all contractual rights and benefits, and all other relief available under California contract law.

**COUNT IX**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
***(Against Defendant University of La Verne)***

147. Plaintiff hereby repeats all the allegations and Exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

148. Plaintiff's employment relationship with the University of La Verne ("ULV") was governed by binding contractual documents, including his tenure appointment, annual faculty contracts, and the ULV Faculty Handbook. Under California law, these documents constitute an enforceable contract.

149. Every contract under California law contains an implied covenant of good faith and fair dealing, which prohibits either party from acting in a manner that unfairly frustrates the other party's right to receive the benefits of the agreement.

150. As a tenured professor, Plaintiff had a contractual right to continued employment absent adequate cause, to fair and impartial disciplinary procedures, to a faculty hearing under § 4.3.3 before any deprivation of tenure, and to an appeal to the Board of Trustees under § 4.3.4.

151. Plaintiff fully performed all contractual obligations throughout his thirty-four-year

career and consistently met or exceeded ULV's expectations in teaching, scholarship, service, and community engagement.

152. ULV breached the implied covenant by acting in bad faith and engaging in conduct designed to deprive Plaintiff of the benefits of his contract, including:

a. resurrecting a 2022 disciplinary warning that had been formally overturned and ordered removed;

b. issuing a 2024 "final warning" based on fabricated or mischaracterized facts;

c. placing Plaintiff on administrative leave without meeting the contractual standard of "immediate harm";

d. misrepresenting Plaintiff's communications with University officials;

e. unilaterally terminating the § 4.3.3 faculty hearing process, despite the Handbook's requirement that only the faculty member may end such proceedings;

f. ignoring the unanimous findings of the CAS-ARPT Committee and the University P&T Committee, both of which concluded that termination was unwarranted; and

g. falsely informing Plaintiff that he had no right to appeal to the Board of Trustees, despite the Handbook's explicit guarantee of such a right.

153. ULV's actions were taken with the intent to frustrate Plaintiff's contractual rights, to manufacture a pretextual basis for termination, and to avoid the procedural protections afforded to tenured faculty.

154. ULV's conduct was arbitrary, retaliatory, and inconsistent with established University norms, AAUP standards, and the reasonable expectations of the parties at the time the contract was formed.

155. As a direct and proximate result of ULV's breach of the implied covenant, Plaintiff suffered loss of his tenured position, loss of salary and benefits, loss of retirement contributions, reputational harm, emotional distress, and the destruction of a decades-long academic career.

156. Plaintiff is entitled to compensatory damages, reinstatement or front pay, restoration of all contractual rights and benefits, and all other relief available under California law.

**COUNT X**
**DEFAMATION**
***(Against All Defendants)***

157. Plaintiff hereby repeats all the allegations and Exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

158. Plaintiff alleges that Defendants made and published false statements of fact about him to third parties, including faculty, administrators, staff, and external organizations, which harmed his reputation and standing in the academic community.

159. Plaintiff alleges that Defendants falsely stated or implied that he was dishonest, insubordinate, untrustworthy, and engaged in "misrepresentation," "breach of trust," and "misconduct," despite documentary evidence contradicting those accusations, including email timestamps, IRB approvals, and the findings of multiple faculty committees.

160. Plaintiff further alleges that Defendants knowingly or recklessly mischaracterized his communications with University officials, particularly his October 2025 conversation with CFO Avo Kechichian, by asserting that Plaintiff lied about the substance of that conversation, even though contemporaneous emails and witness communications allegedly confirmed Plaintiff's account.

161. Plaintiff alleges that Defendants published these false statements in disciplinary letters, administrative memoranda, termination documents, and oral communications to faculty governance bodies and University leadership, thereby disseminating defamatory statements

beyond those with a legitimate need to know.

162. Plaintiff alleges that Defendants' statements were made with actual malice, in that Defendants knew the statements were false, acted with reckless disregard for their truth or falsity, or deliberately ignored evidence demonstrating that Plaintiff had not engaged in the conduct attributed to him.

163. Plaintiff alleges that Defendants' defamatory statements were not privileged because they were made in bad faith, were unnecessary to the performance of any official duty, exceeded the scope of any qualified privilege, and were motivated by discriminatory and retaliatory animus.

164. Plaintiff alleges that Defendants' defamatory statements were published in a manner that foreseeably reached individuals outside the disciplinary process, including faculty members, administrators, and external bodies such as the AAUP, thereby amplifying the harm to Plaintiff's reputation.

165. Plaintiff alleges that the defamatory statements accused him of conduct incompatible with his profession as a tenured professor, including dishonesty, insubordination, and professional misconduct, and therefore constitute defamation *per se* under California law.

166. As a result of the alleged defamatory statements, Plaintiff asserts that he suffered significant harm, including damage to his professional reputation, loss of employment, emotional distress, and diminished standing in the academic and broader community.

167. Plaintiff seeks compensatory damages, punitive damages, and all other relief permitted under California law for the alleged defamation.

## COUNT XI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
***(Against All Defendants)***

168. Plaintiff hereby repeats all the allegations and Exhibits contained in the Complaint

thus far above and incorporates the same as if fully set forth at length herein.

169. Plaintiff alleges that Defendants engaged in extreme and outrageous conduct that exceeded all bounds tolerated in a civilized society, particularly in the context of a thirty-four-year tenured faculty relationship governed by contractual, ethical, and professional obligations.

170. Plaintiff alleges that Defendants knowingly or recklessly subjected him to a campaign of escalating hostility, fabricated disciplinary actions, and retaliatory measures designed to damage his reputation, undermine his professional standing, and force his removal from the University.

171. Plaintiff alleges that Defendants intentionally revived a 2022 disciplinary warning that had been formally overturned and ordered removed, and used it to manufacture a false "pattern" of misconduct, despite knowing that the warning was invalid and should not have been in his file.

172. Plaintiff alleges that Defendants issued a February 2024 Disciplinary Action Notice based on mischaracterized or fabricated facts, including the assertion that Plaintiff violated a verbal instruction, even though Defendants allegedly knew that Plaintiff had followed longstanding institutional practices.

173. Plaintiff alleges that Defendants placed him on administrative leave on January 17, 2025, without cause, without meeting the required standard of "immediate harm," and in a manner designed to isolate him from colleagues, students, and evidence relevant to his defense.

174. Plaintiff alleges that Defendants misrepresented his communications with University officials, including falsely asserting that he lied about statements made by the Chief Financial Officer, despite email timestamps and witness communications allegedly confirming Plaintiff's account.

175. Plaintiff alleges that Defendants treated his protected speech, including his Faculty

Assembly remarks and his contact with the AAUP, as "insubordination," and used those communications as grounds for discipline and termination.

176. Plaintiff alleges that Defendant intentionally disregarded the unanimous findings of the CAS-ARPT Committee and the University P&T Committee, both of which concluded that termination was unwarranted, and instead escalated discipline in a manner inconsistent with University norms and contractual obligations.

177. Plaintiff alleges that Defendants' conduct was intentional, malicious, and carried out with reckless disregard for the near certainty that such actions would cause him severe emotional distress, including anxiety, humiliation, loss of sleep, fear for his professional future, and profound psychological harm.

178. Plaintiff alleges that Defendants' actions were a substantial factor in causing him severe emotional distress, including emotional pain, mental anguish, humiliation, and the destruction of his professional identity and reputation.

179. Plaintiff seeks compensatory damages, punitive damages, and all other relief permitted under California law for the alleged intentional infliction of emotional distress.

**COUNT XII**
**NEGLIGENT SUPERVISION AND RETENTION**
***(Against Defendant University of La Verne)***

180. Plaintiff hereby repeats all the allegations and Exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

181. Plaintiff alleges that Defendant ULV owed a duty of reasonable care in the supervision, training, oversight, and retention of University administrators and personnel who exercised authority over Plaintiff's employment, tenure rights, and disciplinary process.

182. Plaintiff alleges that Defendant ULV knew or reasonably should have known that certain administrators, including those involved in issuing disciplinary warnings, placing Plaintiff

on administrative leave, and recommending termination, were engaging in conduct that was discriminatory, retaliatory, procedurally improper, or otherwise inconsistent with University policy and California law.

183. Plaintiff alleges that Defendant ULV failed to adequately supervise, train, or discipline these administrators, despite clear indications of misconduct, including:

a. the resurrection of a 2022 disciplinary warning that had been formally overturned and ordered removed;

b. the issuance of a February 2024 Disciplinary Action Notice based on mischaracterized or fabricated facts;

c. the misuse of administrative leave procedures without meeting the required standard of "immediate harm";

d. the misrepresentation of Plaintiff's communications with University officials; and

e. the disregard of the unanimous findings of the CAS-ARPT Committee and the University P&T Committee.

184. Plaintiff alleges that Defendant ULV failed to take reasonable steps to prevent foreseeable harm, including emotional distress, reputational damage, and wrongful termination, even after Plaintiff raised concerns through internal grievances, Faculty Assembly remarks, and communications with faculty governance bodies.

185. Plaintiff alleges that Defendant ULV retained administrators who had demonstrated bias, retaliatory intent, or a pattern of procedural violations, and that this negligent retention directly contributed to the escalation of disciplinary actions and the termination of Plaintiff's tenured employment.

186. Plaintiff alleges that Defendant ULV's negligent supervision and retention created

an environment in which false accusations, procedural irregularities, and retaliatory actions were permitted to occur unchecked, resulting in Plaintiff's termination on May 23, 2025.

187. Plaintiff alleges that Defendant ULV's negligence was a substantial factor in causing him harm, including loss of employment, loss of tenure, reputational damage, emotional distress, and the destruction of a thirty-four-year academic career.

188. Plaintiff seeks compensatory damages and all other relief permitted under California law for the alleged negligent supervision and retention.

**PRAYER FOR RELIEF**

189. **WHEREFORE,** for the foregoing reasons and pursuant to the Counts above, Plaintiff, DR. RICHARD ROSE, demand judgment against Defendants, UNIVERSITY OF LA VERNE, DR. LAURA HARTLEY, individual and official capacities, DR. SHANNON MATHEWS, individual and official capacities, DR. RISA DICKSON, official capacity, KEN O'DONNELL, official capacity, and DOE DEFENDANTS 1–20, alleging as follows, and in the alternative, for alternative, for general, compensatory, and punitive damages, reasonable attorney's fees and costs of suit with interest pursuant to 42 U.S.C. 1988, and any further relief which the court may deem equitable and just.

**JURY DEMAND**

190. Plaintiff demands a trial by jury on all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

**CERTIFICATION**

191. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying,

or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully Submitted,

**LLG NATIONAL LAW GROUP**

Dated: September 17, 2026

*_/s/ Renee Walker_*_______________

Renee Walker ESQUIRE
California Bar No. 138283
3003 N. Central Ave. Ste. 685
Phoenix, AZ 85012
(T)888-363-0011
(F) 856.375.1010
attorney@llgnational.com
*Attorney for Plaintiff*